UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

JAMES M. LaVALLEE, and                          Case No. 07-41756
ELIZABETH L. LaVALLEE,                           Chapter 7
                                                                                  Hon. Walter Shapero

               Debtors.
_____/

## **OPINION ON TRUSTEE'S § 707(b)(3) MOTION**

### **I. Introduction**

The matter before the Court is the U. S. Trustee's April 4, 2007, Motion to Dismiss For Abuse Pursuant to 11 U.S.C. § 707(b)(3). The Court held an evidentiary hearing on June 26, 2007, and took the matter under advisement. For the reasons set forth below, the Court grants the U. S. Trustee's Motion to Dismiss.

### **II. Facts**

The Debtors, James and Elizabeth LaVallee, filed a voluntary petition under chapter 7 of the Bankruptcy Code on January 30, 2007. Schedule F lists $96,789 in general unsecured credit card debt, some of which began accruing as far back as the 1990's. James LaVallee is forty-three years old, has been employed with DaimlerChrysler as an I.T. Manager since 1999, and earns an annual salary of $109,000 with a bonus of $6,547 in 2006. Elizabeth LaVallee is a fitness instructor with Body Language III, Inc., has been so employed for at least ten years, and grosses on average $607 per month. The Debtors have two children, one of whom no longer lives with the Debtors, and no other dependents. The applicable state median income is $71,542.

James LaVallee contributed $439.25 per month to a 401(k) plan and an additional $121.50 per month to a SERP/ESERP retirement fund, neither of which was required by his employer. In February or March 2007, his 401(k) contribution was reduced to one per cent of his gross income or $97 per month, with the remainder used to offset living expenses. He has $27,636 in his 401(k) account and is eligible for a pension upon retirement. Schedules I and J exclude contributions made to either of the Debtors' 401(k) plan or SERP/ESERP account and instead show an increase in tax withholding liabilities should the contributions be halted in a hypothetical chapter 13 plan, although only the 401(k) contribution and not the SERP/ESERP is made with pre-tax dollars.

Two loans taken against James LaVallee's 401(k) account require repayment in the amounts of $184.23 and $450 per month, with pay-off dates of October 31, 2007, and August 31, 2011, respectively. Debtors have two mortgages and one equity line of credit on two separate parcels of real property. One mortgage is for $59,800 taken against forty acres of hunting property located in northern Michigan, for which Debtors' are obligated, but which Debtors' family members pay. Expenses associated with the hunting property were not included on Schedule J and no representations were made that amounts paid by the family members on the hunting property were included as income on Schedule I. In addition, Schedule D lists a 2002 mortgage taken against Debtors' principle residence with a balance of $267,144, and a 2004 home equity line of credit taken against the same property with a balance of $134,500. Debtors pay $3,508 or 62% of their net monthly income toward housing costs on their principle residence, inclusive of insurance and taxes. They owe a total of $403,196 in respect to the residence which: (1) is more than the value of the home; and (2) includes amounts owed on the mortgage, the home equity line of credit, 2006 property taxes, and association dues. Debtors' received a 2006 tax refund of $6,163. Schedule I shows a net

monthly income of $5,691 against which $5,655 is taken as expenses, leaving Debtors with a surplus of $36 per month.

The U.S. Trustee filed this Motion to Dismiss Pursuant to § 707(b)(3), alleging that over the course of a 60 month plan the Debtors could pay to unsecured creditors: 1) $27,056.25 or 27.95% of unsecured debt if the 401(k) and SERP/ESERP contributions ceased altogether; 2) $184.23 per month, or $11,053.80 over a 60 month plan, after the first 401(k) loan is repaid; (3) $450 per month for the remainder of a 60 month plan after the second 401(k) loan is repaid; and (4) additional monies, potentially as much as 50% of unsecured debts, if housing costs are reduced.

Debtors argue in response that: 1) Schedules I and J eliminated both the Debtors' 401(k) and SERP/ESERP contributions and thus, the contributions can not be excluded again from a hypothetical chapter 13 plan; 2) if the Debtors are required to find lower cost housing arrangements, their home would be sold at a deficiency of $75,000 to $100,000, increasing their debt load and negating any benefit from the less expensive housing; and 3) the ability to pay alone as discussed in *In re Krohn*, 886 F.2d 123 (6th Cir. 1989), no longer merits dismissal post-BAPCPA absent other indicia of abuse, because § 707(b)(3) requires an analysis of the totality of the circumstances of the Debtors' financial situation. Debtors also argue that the U.S. Trustee's calculations neglect to consider attorney fees and the chapter 13 administrative fee of four per cent which reduce future disbursements to unsecured creditors by $5,021.

### III. Discussion

A petition for relief filed under chapter 7 is subject to dismissal if it was: 1) filed by an individual; 2) with primarily consumer debts; and 3) the granting of relief would be an abuse of chapter 7. 11 U.S.C. § 707(b)(1). Although as much as 47% of Debtors' unsecured debt is

-3-

attributable to business debt accrued as far back as the 1990's, the remainder of the debt including all $468,836 of secured debt, is consumer debt. The petition is therefore subject to dismissal if warranted. Two statutory methods are prescribed for evaluating the existence or nonexistence of abuse sufficient to warrant dismissal. First, under the means test, above median income Debtors calculate annualized income less allowable expenses and compare that result to the statutory threshold of 11 U.S.C. § 707(b)(2)(A). If the Debtors' income less expenses meets or exceeds the threshold established by Congress, abuse is presumed and only a showing of special circumstances will rebut that presumption. 11 U.S.C. § 707(b)(2)(B). Below median income debtors, individuals who fall below the statutory threshold described above, or those who are successful in rebutting the presumption of abuse, are still at risk of dismissal although no presumption of abuse attaches if their petition was filed in bad faith or if the totality of their financial situation demonstrates abuse. 11 U.S.C. § 707(b)(3). The means test of § 707(b)(2) purports to identify and separate out by way of objective evaluation those individuals Congress believes have an ability to repay at least a portion of their debts in bankruptcy, and eliminate judicial discretion as it relates to those debtors, while § 707(b)(3) affords a more discretionary and subjective means of dismissal where circumstances warrant. Section 707(b)(3) provides:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider -
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

-4-

There being no presumption of abuse and no allegation of bad faith in this case, the Court looks to the totality of the Debtors' financial situation to determine whether the chapter 7 process is abused by this filing. The following factors are relevant to that determination: 1) the stability of the income source(s); 2) whether Debtors are eligible for chapter 13 relief; 3) the existence of state remedies with the potential to relieve the Debtors' financial predicament; 4) the degree of relief obtainable through private negotiations with creditors; and 5) the probability of reducing expenses significantly without depriving Debtors of necessities. *In re Krohn*, 886 F.2d at 126-27.

**a. The Ability to Pay**

A central issue in the present case is how much weight is to be afforded the debtors' ability to pay under a totality of the circumstances analysis of § 707(b)(3)(B). The U.S. trustee contends that the debtors' have an ability to pay a least a portion of their debts and that their chapter 7 filing should therefore be dismissed for abuse. The U.S. trustee relies heavily on the language of *In re Krohn*, a pre-BAPCPA case, which states that the ability to pay alone *may be* sufficient to warrant dismissal for abuse. *Id.* at 126.

Pre-BAPCPA cases evaluating whether to dismiss a case for substantial abuse routinely employed an analysis with an ability to pay component, although the degree to which courts relied on the debtors' ability to pay varied. *In re Henebury*, 361 B.R. 595, 604 (Bankr. S.D. Fla. 2007). In the Sixth Circuit, *In re Krohn* set forth the test for determining when and whether a case should be dismissed for substantial abuse, stating:

> In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances whether he is merely seeking an advantage over his creditors, or instead is "honest," in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings,

and whether he is "needy" in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets. Substantial abuse can be predicated upon either lack of honesty or want of need.

. . . .

Among the factors to be considered in deciding whether a debtor is needy is his ability to repay his debts out of future earnings. That factor alone may be sufficient to warrant dismissal.

*In re Krohn*, 886 F.2d at 126 (citations omitted). In the wake of BAPCPA, courts have concluded that pre-BAPCPA law was incorporated in and codified by § 707(b)(3), with the dishonesty component codified under § 707(b)(3)(A) and lack of need under § 707(b)(3)(B). *In re Edighoffer*, 2007 WL 2769631, at *2 (Bankr. N.D. Ohio Aug. 6, 2007). Other courts have surmised that the means test analysis of § 707(b)(2) is a codification of pre-BAPCPA "ability to pay" whereby the debtor's ability to pay his debts, standing alone, was sufficient to justify dismissal. *In re Nockerts*, 357 B.R. 497, 505 (Bankr. E.D. Wis. 2006). Many agree that pre-BAPCPA substantial abuse law continues to be relevant post-BAPCPA and that a debtor's ability to pay his debts continues to be relevant to a § 707(b)(3) analysis. *In re Zaporski*, 366 B.R. 758, 770-71 (Bankr. E.D. Mich. 2007); *In re Mestemaker*, 359 B.R. 849, 853-57 (Bankr. N.D. Ohio 2007)*; In re Pak*, 343 B.R. 239, 243-44 (Bankr. N.D. Cal. 2006).

This Court on recent occasion has reviewed the decisions of *In re Krohn* and *Behlke v. Eisen* (*In re Behlke*), 358 F.3d 429 (6th Cir. 2004) and has concluded that the ability to pay creditors is relevant to a post-BAPCPA totality of the circumstances analysis but that it is only one factor among others of some similar import to be considered. *See, e.g.*, *In re Shelby*, No. 06-48745 (Bankr. E.D. Mich. July 25, 2007). The Court is not persuaded to adopt a different conclusion in this case.

-6-

Accordingly, in reviewing the totality of the circumstances of the debtors' financial situation in this case, the ability to pay is one of many factors to be considered. Furthermore, as to the weight to be afforded it, it would be the rare case, at least in this Court's view, where dismissal of a chapter 7 case would be warranted when most if not all factors other than the ability to pay weighed against a finding of abuse.

**b. Housing Costs**

Having appraised their home via two online appraisal services, Debtors, who admittedly have made no attempt to sell their home, argue that they are unable to reduce housing expenses because the sale or foreclosure of their home would result in a deficiency of some $75,000 to $100,000. The online appraisals place the value of Debtors' home between $314,000 and $333,603. (Debtors' Ex. A, B). Schedule A shows a 2006 SEV of $191,500, equal to an assessed value of $383,000. As noted, Debtors owe $267,144 on a mortgage, an additional $134,500 on a home equity line of credit secured by their home, property taxes, and home owners association fees, for a total of $403,196, and it may fairly be said that at the moment the housing market is soft or worse.

Debtors' housing expense of $3,508 per month, inclusive of insurance and taxes but exclusive of utilities, is more than two and one half times higher than the applicable Local Housing and Utilities Standard for a family of four in Oakland County, Michigan of $1,353. Their housing expense consumes a full 62% of their net monthly income. Assuming the sale of the home results in a deficiency of $75,000 as Debtors claim, their unsecured debt could escalate to as much as $171,789. This assumes, of course, that a claim of deficiency is filed. Reviewing the numbers, if the Debtors are allowed two times the housing allowance, or $2,706 per month for housing and utilities, they could contribute to unsecured creditors $802 per month, equal to $48,120 over the life of a 60 month

-7-

07-41756-wsd    Doc 38    Filed 01/03/08    Entered 01/03/08 17:48:19    Page 7 of 10

plan. This is the equivalent of a 25% dividend if unsecured debts equal $171,789, and the four per cent administrative fee and no-look attorney fees are deducted as counsel argues. If no deficiency results from the sale of the home or if a claim of deficiency is not filed as the case may be, Debtors could pay 44% of the scheduled $96,789 in unsecured debt, again inclusive of the statutory chapter 13 fee and no-look attorney fee deductions. In either case, a significant dividend is involved.

**c. Retirement Contributions and 401(k) Loan Repayments**

The U.S. Trustee next argues that the Debtors' could pay a meaningful dividend to unsecured creditors if the 401(k) and SERP/ESERP contributions were stopped. Since neither retirement contribution was included in Debtors' Schedules, those amounts have already been considered disposable income and it would not be proper to require the Debtor to again exclude the contributions under a hypothetical chapter 13 plan.

Debtors first 401(k) loan has as of this date been paid in full, and Debtors now have $184.23 per month or $11,053.80 over 60 months with which to pay unsecured creditors. Assuming the case were converted to chapter 13 forthwith, Debtors would have an additional $450 per month for the remaining 16 months of a 60 month plan after the second 401(k) was repaid. All told, after the deduction of the four per cent statutory fee and giving Debtors' counsel the benefit of the $3,400 no-look fee, Debtors would have $14,123.65 to pay to unsecured creditors representing 14% of their unsecured debt after the termination of their 401(k) loan obligations alone.

### IV. Totality of the Circumstances and Conclusion

The stability of James LaVallee's employment is an important aspect of this case. He has worked for some eight years at DaimlerChrysler (a company recently sold to a private equity firm) and testimony indicated that his department was undergoing some level of outsourcing. These are

facts which might give one cause for concern. On the other hand, James LaVallee has enjoyed increasing levels of income over the years as evidenced by the statement of financial affairs, and he received a bonus in 2006. That James LaVallee's employment might be in imminent danger of termination or that his particular job will be outsourced is at best too speculative to have the decision turn upon it. Nor does it take into account what financial arrangements and/or re-employment opportunities might be made or offered to him incident to any potential departure.

Summing up and looking to the other circumstances of Debtors' financial situation, Debtors are eligible for chapter 13 relief and they have an ability to pay a minimum of 14% of unsecured debts if they remain in their home and up to as much as 62% if housing costs are reduced if no deficiency is sought upon the sale of their home. One might say that given the recited facts and current economic situation, there is a theoretical likelihood of there being a deficiency owed by Debtors if the residence were foreclosed upon now and sold within a relatively short period. However, balanced against the Debtors' stated intention to keep their residence and reaffirm their related debts, and considering the time frames involved in foreclosure and redemption periods - in the context of the current potential regulatory and policy climate that seems to be moving in favor of at least some homeowners being foreclosed upon, the likelihood of a large deficiency on the home if sold a year or two from now is simply too speculative at this point to be a sufficiently major contributing factor in this particular case militating in favor of Debtors' position on the Motion. It should also be noted that if future tax refunds are considered, even more could be paid into a plan. As above median income earners, James LaVallee's annual base salary alone is $30,000 more than the median income for a family of four in Michigan. With one child no longer residing in the family home, the Debtors may find themselves experiencing a reduction in overall expenses. Finally, reducing Debtors' housing

expenses to twice that of the local standard allows Debtors some flexibility to pay into a plan without being deprived of adequate housing or other necessities.

The Court's decision is required to be based on the current situation and what can be reasonably predicted for the relatively near future, in the context of legislation, the intent of which is to move Debtors toward using their best efforts to repay their debts. It may very well be that adverse present day concerns over job longevity or home values may later in fact come to pass in a way that would, in hindsight, validate Debtors' present day dire predictions. That potential does not, however, preclude a decision today that requires an otherwise able debtor, even a somewhat over-extended one, to consider, and indeed choose if bankruptcy relief is deemed desirable to at least attempt to confirm a chapter 13 plan. If, thereafter, circumstances become such as make continuing such no longer feasible, the statutory intent at least up to that point would have been fulfilled and their position and options will be clearer and less prone to attack.

On balance, therefore, the Court finds that the factors do demonstrate abuse. Accordingly, the U.S. Trustee's Motion to Dismiss is granted unless, within 20 days from the entry of the order effectuating the Opinion, the Debtors convert this case to a chapter 13 proceeding. The U.S. Trustee shall present an appropriate order.

**Signed on January 03, 2008**

              **/s/ Walter Shapero**
              **Walter Shapero**
              **United States Bankruptcy Judge**